OPINION
{¶ 1} Plaintiff-appellant GZK, Inc., appeals from a trial court decision dismissing *Page 2 
GZK's claim for contractual interference against Defendant-appellee F.F.F. Management, Inc. The dismissal was based on GZK's alleged lack of standing and a finding that the contracts upon which the claim was based were unenforceable.
 {¶ 2} GZK contends that the trial court erred in failing to follow the law of the case set forth in an opinion we issued in October 2003. GZK further contends that the trial court erred in finding contracts of December 2000, and January 2001, illusory and unenforceable, and in finding that GZK was not a third-party beneficiary of a purchase agreement. Finally, GZK contends that the trial court erred in holding that GZK lacked standing to bring a claim for tortious interference with contract.
 {¶ 3} We conclude that the trial court erred in failing to apply the law of the case established in our prior opinion. Contrary to the trial court's conclusion, the contracts in question were valid and enforceable, and GZK had standing to bring its claim for tortious interference with contract. Accordingly, the judgment of the trial court is Reversed, and this cause is Remanded for further proceedings.
 I. {¶ 4} This case involves a titanic struggle between entities competing for a parcel of land in Miamisburg, Ohio. This legal odyssey began more than seven years ago and has spawned two separate lawsuits and three trips to the court of appeals. The current appeal is the third in the series, and the case has yet to be tried.
 {¶ 5} One of the entities is GZK, which leased part of the parcel from the owner, Schumaker Limited Partnership (Schumaker, L.P.), and its predecessors between 1984 *Page 3 
and 2004.1 GZK's original lease was for a fifteen-year term, and provided that the premises would be used for the sole purpose of operating a fast-food restaurant. The agreement contained a "competitor exclusion," which stated that:
 {¶ 6} "During the term or any extension hereof, Lessor agrees not to rent to or for, construct a building for, or sell or lease land to or for any similar or competitively menued fast food operation within one mile of the Leased Premises without Lessee's prior written consent." 1984 Lease Agreement, ¶ 26.
 {¶ 7} The lease also contained a "right of first refusal," indicating that:
 {¶ 8} "Lessees shall have the right of first refusal to purchase the balance remaining of Lot 2782, City of Miamisburg, owned by the Lessor of which the leased premises herein is a portion thereof. No further amount need be paid by Lessee to Lessor for this right of first refusal." Id. at ¶ 30.
 {¶ 9} The 1984 lease was recorded in the Mortgage Records of Montgomery County at Microfiche 84-1514 BO5. Subsequently, in July 1998, the lease was extended for ten years, through January 31, 2009. Rental amounts were changed, but all other lease terms remained unchanged and in full force and effect, per ¶ s 2-3 of the Lease Amendment. This amendment was also filed with the Montgomery County Recorder.
 {¶ 10} During the lease term, GZK operated an Arby's Restaurant on the premises, and was operating the restaurant at all times pertinent to this action. In the year 2000, *Page 4 
GZK had also been negotiating with Mrs. Schumaker to purchase the entire parcel on which the Arby's was located, so that GZK could build a Lee's Famous Recipe restaurant.
 {¶ 11} The other entity involved in this land struggle is F.F.F. Management, Inc., which is in the business of opening and operating Kentucky Fried Chicken (KFC) Restaurants. In fact, FFF owns forty-two KFC restaurants. FFF, itself, is owned by two separate corporations, each having a 50% interest. These corporations are T.R. Foods, Inc., which has Terry Robinson as its sole shareholder, and Chicken Champs, Inc., which has Peter Wasilevich as its sole shareholder. Robinson and Wasilevich are also the president and vice-president of FFF, respectively. The reason separate corporations are used is for financing purposes.
 {¶ 12} FFF also owns a company called Food, Folks, and Fun, Inc., which FFF uses as an "operating arm." FFF owns the real estate on which KFC restaurants are built and leases the real estate to Food, Folks and Fun, which in turn operates the restaurants. In addition to the forty-two restaurants involved in FFF, T.R. Foods separately owns twelve KFC franchises. Similarly, Chicken Champs separately owns ten KFC franchises.
 {¶ 13} At some point in 1999, FFF entered into an agreement to acquire KFC restaurants from a company called Tricorn, Inc. The agreement included three options to build KFC restaurants and an opportunity to build as many restaurants as made sense, based on distribution. As part of its obligation, FFF was required to build one KFC restaurant a year for three years, including a restaurant in Miamisburg, Ohio. Consequently, FFF asked real estate agent, Richard Staley, of Don Wright Realty, Inc., to locate commercial real estate in the Miamisburg area that was available for purchase and upon which FFF could build a KFC restaurant. Staley was also searching for locations in *Page 5 
the other two areas for which FFF had options (Bellbrook and Huber Heights). During January through July or August, 2000, FFF and Staley looked at many possibilities in all three areas.
 {¶ 14} In the spring of 2000, Staley approached Dorothy Schumaker about the potential sale of Parcel 2782 and the Arby's Building to FFF. At the time, Mrs. Schumaker was a widow who was nearly 73 years old. After his first meeting with Mrs. Schumaker on May 27, 2000, Staley obtained a copy of the GZK lease agreement from the Recorder's office. Staley read the clause regarding the right of first refusal and was aware of the existing GZK lease.
 {¶ 15} Subsequently, on August 31, 2000, FFF, through Staley, gave Mrs. Schumaker a written offer of $800,000 for the property, but she did not sign the offer. On November 15, 2000, Mrs. Schumaker signed a purchase agreement with a specified price of $835,000 for the land and the Arby's restaurant. This agreement indicated that the seller would furnish a deed free and clear of "easements and restrictions of record that would not prevent the Purchaser from using the Property for the following purpose: Restaurant." The document also specified a closing date of December 22, 2000. FFF authorized Staley to make this offer to Mrs. Schumaker, but did not sign the agreement before it was presented to her.
 {¶ 16} On November 15, 2000, Staley also persuaded Mrs. Schumaker to sign a "dual agency" agreement, acknowledging that Staley was acting on her behalf as the seller, and on FFF's behalf, as the buyer. Before this document was executed, Staley was acting solely on behalf of FFF. Larry Robinson, FFF's president, signed the dual agency agreement on November 30, 2000. There is some dispute about exactly when FFF *Page 6 
signed the purchase agreement, as will be discussed below. However, Staley prepared a letter dated November 16, 2000, for Mrs. Schumaker to send to Steven Stanforth of GZK regarding the right of first refusal. Stanforth was GZK's vice-president and chief financial officer.
 {¶ 17} The November 16 letter indicated that Schumaker had an offer on the property that she would accept, contingent on GZK's right of first refusal. The letter also stated that the offer was for $835,000 cash at closing and that the buyer wished to close the transaction by December 22, 2000. Finally, the letter instructed GZK to respond in writing within seven days if it wanted to purchase the property.
 {¶ 18} Staley testified that Mrs. Schumaker was not going to notify GZK that the property had been sold, but that he felt GZK should be notified "out of courtesy to GZK." Concerning this letter, Staley testified that:
 {¶ 19} "I didn't send this letter to them. She did. I said, I told her, `are you gonna notify GZK,' and she said, `no, I don't think so.' And I said, `Dorothy, out of common courtesy, you should notify them.' She said, `Fine, write `em a letter and I'll sign it and send it.' And that's what I did.
 {¶ 20} "If she didn't want to do it, it wasn't any of my business. I'm tryin' [sic] to be a nice guy." October 25, 2001 Deposition of Richard Staley, pp. 47-48.
 {¶ 21} In contrast, Mrs. Schumaker testified that she told Staley about the right of refusal and that they would have to show GZK the purchase contract. Mrs. Schumaker also denied telling Staley that she did not want to send the right of refusal letter to GZK.
 {¶ 22} The letter informing GZK of the purchase contract was not sent right away. In fact, the envelope was postmarked November 29, 2000, and GZK did not receive the *Page 7 
letter until December 4, 2000. Upon receiving the letter, Stanforth immediately called Mrs. Schumaker to discuss the contract and GZK's right of first refusal. Stanforth then sent Mrs. Schumaker a letter on December 8, 2000, confirming an agreement between Schumaker and GZK that GZK would have a thirty-day time frame, or until December 31, 2000, to exercise its right of first refusal. On December 11, 2000, GZK and Schumaker extended this time frame to February 28, 2001, by mutual agreement, and noted that fact on the December 8, 2000 letter. The reason for the extension was so Mrs. Schumaker could receive advice from her tax consultant regarding whether it would be preferable to receive the $835,000 in one lump-sum cash payment or to receive installment payments for all or part of the purchase price.
 {¶ 23} Subsequently, on December 13, 2000, GZK sent Mrs. Schumaker a letter outlining what had transpired regarding FFF's purchase offer, as reflected in Schumaker's November 16, 2000 letter. GZK's letter then stated:
 {¶ 24} "[T]his letter serves as formal notification of GZK's exercise [sic] our Right of First Refusal for the purchase of this property (Lot 2782 in Miamisburg). We are prepared to complete this transaction in accordance with the timeframes agreed to in our agreement dated December 8, 2000.
 {¶ 25} "This letter serves as protection for you and GZK by documenting our exercise of the Right of First Refusal, and our final agreement as to the time frame involved for the closing of the transaction. If this letter accurately reflects our understanding, please indicate your approval by signing below in the space provided."
 {¶ 26} Mrs. Schumaker signed the December 13, 2000 letter, agreeing to the content, and returned the letter to GZK. GZK then filed the document exercising the right *Page 8 
of first refusal with the Montgomery County Recorder on December 15, 2000. Mrs. Schumaker testified in her deposition, taken eight months later, that she believed GZK had exercised its right of first refusal, that GZK had matched FFF's offer, that GZK had agreed to pay her $835,000 in cash for the property, and that she intended to sell her property to GZK for $835,000.
 {¶ 27} On December 13, 2000, Mrs. Schumaker received a letter from FFF's attorney, setting a closing date. Subsequently, on December 15, 2000, GZK sent copies of all pertinent documentation to FFF's attorney, Timothy Geraghty, including Schumaker's letter about the right of first refusal, the letter agreement between GZK and Schumaker exercising the right of first refusal, and an affidavit concerning the exercise that had been filed with the recorder's office. Despite receiving these documents, Geraghty sent Mrs. Schumaker a letter on December 21, 2000, which she perceived as threatening and intimidating. The letter stated that Mrs. Schumaker was required to sell the property to FFF and that she would be in breach of contract if she did not attend FFF's closing. The letter also stated that Mrs. Schumaker would be required to pay Staley's commission, which at the six percent rate in the purchase agreement, would have amounted to more than $50,000. Peter Wasilevich, FFF's vice-president, authorized the letter to Mrs. Schumaker.
 {¶ 28} Mrs. Schumaker did not attend the closing on December 22, 2000. On January 22, 2001, Mrs. Schumaker and GZK signed an agreement, noting that GZK had exercised its right of first refusal by letter of December 13, 2000, and that Schumaker had assented to the exercise of the right. The agreement further stated that:
 {¶ 29} "1. Seller shall sell to GZK's designee (the `Buyer') and the Buyer shall *Page 9 
purchase from the Seller the Property for the purchase price of $835,000 (the `Purchase Price').
 {¶ 30} "2. The Purchase Price shall be paid at the Closing as hereinafter defined in the manner provided and in accordance with the terms set forth on Exhibit B which is attached hereto and made a part hereof.
 {¶ 31} "3. The Closing shall take place on or before April 30, 2001, unless extended by agreement of the parties, and shall be held at the offices of the Buyer at 10:00 a.m., or at such other time and place agreeable to the parties.
 {¶ 32} "4, At the Closing, the Seller shall deliver to the Buyer a general warranty deed conveying to the Buyer marketable title, free and clear of all liens and encumbrances, excepting those liens and encumbrances which are permitted by the Buyer.
 {¶ 33} "5. The Seller shall deliver possession of the property to the Buyer at the closing."
 {¶ 34} Exhibit B indicated that before the closing, the parties would decide the manner in which the purchase price was to be paid. Again, this was an accommodation to Mrs. Schumaker so that she could receive payment in the manner she desired: either in a lump sum or in installments.
 {¶ 35} On February 15, 2001, FFF filed an action against Mrs. Schumaker and Schumaker, L.P., asking the court to grant specific performance of the contract of purchase entered into on November 15, 2000, or to find that the defendants had breached the contract and award damages for loss of profits in excess of $100,000. See F.F.F.Management, Inc. v. Schumaker, Montgomery Cty. C.P. No. 2001 CV 0789. In March *Page 10 
2001, Schumaker filed a motion in Case No. 2001 CV 0789, asking the court to require that GZK be joined as an indispensable party. A few days later, GZK filed a motion to intervene in the action. In the motion, GZK claimed an interest in the real estate, due to the lease agreement and to the January 22, 2001 purchase agreement entered into by GZK and Schumaker. GZK noted that its closing on the property was scheduled for April 30, 2001, and GZK could not protect its interest in the property without being added as a party to the action.
 {¶ 36} The court initially added GZK as a party plaintiff under Civ. R. 19 on April 24, 2001, and then vacated that order and granted GZKs motion to intervene in May 2001. In the meantime, the closing scheduled for April 30, 2001 did not go forward. Stanforth indicated that the closing was postponed until September 30, 2001, to give Mrs. Schumaker time to consult with her accountant, who was busy with tax season. The lawsuit was also an inhibiting factor because Schumaker did not want to close while the lawsuit was pending.
 {¶ 37} GZK filed its answer as an intervening defendant in June 2001, alleging that it had entered into a purchase agreement for the property. GZK also asked the court to permit it to proceed with the purchase. Subsequently in July 2001, Schumaker filed a third-party complaint against Staley and Don Wright Realty, Inc., based on a number of claims, including breach of fiduciary duty, fraudulent misrepresentation, collusive conduct, and negligence. In Count V, Schumaker alleged that Staley had deceived her and had colluded with FFF to secure a contract for the purchase of the property, with knowledge of GZKs interest.
 {¶ 38} The closing date for the GZK purchase was subsequently extended until *Page 11 
October 31, 2001, again by agreement of GZK and Schumaker. Mrs. Schumaker had become increasingly agitated about the litigation, had claimed that it had adversely affected her physical and mental health, and had stated that she did not want to close on the property while the FFF litigation was pending. Schumaker also had not yet consulted with her tax advisor as to how the payment should be structured.
 {¶ 39} In October 2001, FFF filed a motion for summary judgment. In replying to the motion, GZK again claimed that it had a binding agreement with Schumaker to purchase the property. GZK and Schumaker then entered into another agreement on October 24, 2001, allowing the closing date to be extended until January 31, 2002.
 {¶ 40} Subsequently, in its own summary judgment motion filed in December 2001, GZK contended that FFF never had a valid contract to purchase the property. Specifically, the offer that Schumaker signed on November 15, 2000, stated that the offer would expire on November 22, 2000, at 4:59 p.m. However, the deposition testimony of FFF's president, Terry Robinson, and of the realtor, Staley, indicated that FFF failed to sign the offer until the end of November, or at the earliest, until after Thanksgiving, which was on November 23, 2000.
 {¶ 41} FFF responded with an affidavit from Robinson, who supplemented his deposition testimony due to investigation that occurred after the deposition. Robinson claimed he had signed the offer on November 17, 2000, and had mailed it to Staley. In addition, Staley filed an affidavit, stating that he had delivered a copy of the executed agreement to Mrs. Schumaker's mailbox on November 22, 2000. An affidavit was also in evidence in which Mrs. Schumaker denied receiving the signed purchase contract until after November 22, 2000. *Page 12 
 {¶ 42} As was noted, the GZK-Schumaker closing was scheduled for January 31, 2002, at the latest. On January 28, 2002, FFF sent Mrs. Schumaker a letter outlining terms of a proposed lease for a one-acre parcel on the premises, to be used to construct and operate a KFC restaurant. The lease was made subject to compliance with the "competitively menued" restrictions in the existing lease between GZK and Schumaker. It also provided that FFF would defend and indemnify Schumaker L.P. from all liabilities related to the "competitively menued" restrictions in the GZK lease.
 {¶ 43} Payments for the one-acre parcel were to be $36,000 per year for five years and $40,000 per year for ten years thereafter, with an option to extend the lease for two five-year renewal terms at the rate of $40,000 per year, or a total of $580,000 for the initial fifteen-year term and a potential of $400,000 more if FFF exercised its options. The proposed agreement also provided that Schumaker would establish restrictions satisfactory to FFF prohibiting the use of an adjacent undeveloped parcel for the sale of chicken or chicken products for so long as the KFC Restaurant was being operated on the premises. Mrs. Schumaker indicated that she was afraid to go forward with the GZK closing after being sued by FFF. Mrs. Schumaker also stated that before the anticipated closing date with GZK on January 31, 2002, FFF agreed to dismiss its lawsuit if she entered into a lease on the property with an option to purchase. In order to secure FFF's dismissal of the lawsuit, Mrs. Schumaker signed the letter on January 31, 2002, agreeing to FFF's proposed lease terms. FFF then dismissed the pending lawsuit against Mrs. Schumaker, without prejudice, the same day, which was the day GZK had scheduled its closing on the property.
 {¶ 44} While the above transactions were occurring, GZK prepared for the *Page 13 
anticipated closing on January 31, 2002, by obtaining a cashier's check for $835,000 made payable to Schumaker L.P. GZK also attended the closing on January 31, 2002, prepared to tender the check in exchange for a general warranty deed to the property, but Schumaker did not appear. Schumaker thereafter refused to appear for closing and refused to deliver a warranty deed for the property to GZK. As a result, GZK filed the present action to compel specific performance against Mrs. Schumaker and Schumaker, L.P. on February 8, 2002.
 {¶ 45} In April 2002, GZK filed an amended complaint adding FFF as a party and requesting specific performance, damages, and injunctive relief. Among other things, GZK claimed that FFF had tortiously interfered with GZKs contractual and business relationships with Schumaker.
 {¶ 46} FFF filed a motion for summary judgment in July 2002, claiming now that its offer had expired before it was signed by FFF, and that GZK therefore had no right of first refusal. This contention was supported by Wasilevich's affidavit, which claimed that FFF did not accept Schumaker's November 15, 2000 "offer" in a timely fashion and that FFF did not have a valid contract to purchase the property. This contradicted the prior testimony of both Robinson and Staley.
 {¶ 47} FFF also claimed that the January 22, 2001 agreement between GZK and Schumaker was unenforceable because it was illusory. In this regard, FFF noted that the agreement provided that Schumaker would sell the property not to GZK, but to GZK's designee. The excerpts from Stanforth's deposition attached to FFF's motion indicate that the issue of a potential designee was covered in detail during the deposition.
 {¶ 48} In responding to FFF's arguments, GZK stressed that FFF had contradicted *Page 14 
evidence that it had submitted during the first lawsuit. GZK also argued that the contract was not illusory because GZK became obligated to purchase the property when it exercised its right of first refusal on December 13, 2000. Although GZK and Schumaker agreed on January 22, 2000, that the property would be sold to GZK or GZKs designee, GZK was legally obligated, under the exercise of the right of first refusal, to purchase the property itself or to cause its designee to purchase the property. See August 19, 2002 GZK Memorandum, p. 25.
 {¶ 49} The trial court granted summary judgment in favor of FFF and Schumaker in January 2003, based on a finding that the contract was illusory and unenforceable. GZK then appealed, and we reversed the trial court's decision. See GZK, Inc. v. Schumaker Ltd. Partnership, Montgomery App. No. 19764, 2003-Ohio-5842 (GZK I). We concluded that the trial court erred in failing to consider extrinsic evidence to clarify the terms in the January 22, 2001 agreement, which referred to GZK's "designee." In this regard, we noted that:
 {¶ 50} "When the December 13, 2000 letter, wherein GZK first indicated its intent to exercise its right of first refusal, is considered in conjunction with the Agreement, it is clear that from the start GZK was obligating itself to purchase the Property. After all, before FFF ever entered the picture, GZK had been seeking to purchase the Property from Schumaker in order to build a Lee's Famous Recipe restaurant. The depositions illustrate that at no time did GZK or Schumaker ever indicate the possibility of a third party purchasing the Property instead of GZK. Furthermore, all of the subsequent writings delaying the closing of the purchase of the Property also indicated GZK as the buyer. Therefore, the trial court's conclusion that GZK was not bound to purchase the Property *Page 15 
from Schumaker was incorrect.
 {¶ 51} "The trial court also noted that GZK and Schumaker never agreed upon specific payment terms. Schumaker was willing to accept $835,000 cash on December 22, 2000 from FFF for the purchase of the property, but she apparently began to have second thoughts about the tax consequences of accepting such a large amount of cash. Accordingly, for Schumaker's benefit the January 22, 2001 Agreement excluded payment terms. Schumaker and GZK repeatedly and mutually agreed to delays in closing on the purchase of the Property, again for Schumaker's convenience. There is no dispute that GZK was willing and able to pay cash for the Property both on December 22, 2000, and throughout the delays thereafter. It would be inequitable to punish GZK for its attempts to accommodate Schumaker in reaching a different payment agreement than she had originally accepted from FFF.
 {¶ 52} "We conclude that there were no genuine issues of material fact and that when extrinsic evidence is considered in addition to the written Agreement, it is clear as a matter of law that GZK successfullyexercised its right of first refusal and entered into an enforceablecontract to purchase the Property from Schumaker." Id. at ¶ 23-25 (emphasis added).
 {¶ 53} Because we found that GZK and Schumaker had entered into an enforceable contract to purchase the property, we found that GZK was "entitled to a permanent injunction to prevent Schumaker and FFF from entering into a lease for the Property and from making any improvements upon the Property." Id. at ¶ 28. We instructed the trial court to enter a permanent injunction on remand. Id.
 {¶ 54} Our decision was issued in October 2003. On January 30, 2004, the trial *Page 16 
court signed and filed an agreed entry, which states as follows:
 {¶ 55} "By agreement of counsel and pursuant to the decision of the Court of Appeals in this matter on October 31, 2003, IT IS HEREBY ORDERED that Defendant Schumaker Limited Partnership convey by General Warranty Deed to Plaintiff GZK, Inc, the property situated at 110 S. Heincke Road, Miamisburg, which property is more particularly described as follows:
 {¶ 56} "Situate in the City of Miamisburg, Ohio, County of Montgomery and State of Ohio and Being Lot Numbered 2782 of the consecutive numbers of Lots of the City of Miamisburg, Ohio (Parcel No. K46-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)
 {¶ 57} "IT IS FURTHER ORDERED that the closing on the property shall occur at the offices of Plaintiff at 660 Fame Road, Dayton, Ohio, 45449 on March 15, 2004 at 10:00 AM and that payment to Schumaker Limited Partnership in the amount of $835,000 be made by cashier's check by GZK, Inc. to Schumaker Limited Partnership in exchange for delivery by Schumaker Limited Partnership of the General Warranty Deed."
 {¶ 58} This order was authorized and approved by counsel for both GZK and Schumaker and was signed by the trial judge. The trial court also issued an identical order on March 16, 2004, with the additional requirement that the Defendants cooperate with Plaintiffs and allow Plaintiffs agents to enter the property for purposes of conducting surveys.
 {¶ 59} The property was subsequently conveyed to GZK's designee, KMS-1, and GZK then dismissed Dorothy Schumaker and Schumaker L.P., without prejudice pursuant to Civ. R. 41(A)(1), on September 29, 2005.
 {¶ 60} In the meantime, discovery had proceeded on the remaining issues in the *Page 17 
case — FFF's alleged tortious interference with GZK's contracts and business relationships. Depositions of Robinson, Wasilevich, and Stanforth were again taken in September and October 2004.
 {¶ 61} FFF then filed a motion for summary judgment in January 2005, claiming that the tortious interference claims presented a pure question of law to the court because FFF was acting only to protect its business interests without advancing improper means. FFF noted in the motion that the closing of the property had taken place on March 15, 2004, "effectively granting GZK specific performance of the Agreement." January 18, 2005 FFF Motion for Summary Judgment, p. 6. FFF also filed copies of the most recent depositions, including Stanforth's deposition, and relied on the depositions in arguing for summary judgment. FFF did not claim at this point that the contract was illusory or that GZK lacked standing.
 {¶ 62} GZK responded to the motion and also filed its own motion for partial summary judgment on March 21, 2005. GZK contended that the court could decide as a matter of law that FFF had intentionally and wrongfully interfered with GZK's contractual and business relationships because FFF had no legally protected interest after GZK properly exercised its right of first refusal.
 {¶ 63} In April 2005, FFF filed yet another motion for summary judgment, this time contending that the agreement between GZK and Schumaker was illusory, and, therefore, unenforceable, because it only obligated GZK's designee, not GZK, to close. FFF contended that "additional discovery" had disclosed that GZK never intended to purchase the property and had always intended its designee, KMS-1, to do so. Accordingly, FFF concluded that the prior appellate opinion did not govern as the "law of the case" because *Page 18 
a "new state of facts" had been established on remand.
 {¶ 64} In its response, filed in May 2005, GZK asserted that it was the party who had contractual and business relationships with Schumaker, and that the fact that an entity affiliated with GZK ended up holding title to the property was irrelevant. Specifically, GZK was the party whose contracts and relationships were affected. In particular, GZK was precluded from operating a fast-food restaurant on the property for three years due to FFF's alleged interference. GZK further alleged that if KMS-1, its related entity, had filed the lawsuit, FFF would have argued that GZK was the real party in interest.
 {¶ 65} Before ruling on these motions, the trial court issued a discovery order, which FFF immediately appealed in July 2005. GZK had subpoenaed financial documents of Food, Folks, and Fun (Food-Folks), the "operating arm" of FFF. On appeal, we noted that FFF was a corporation that "exists for the purpose of buying real estate and leasing it to Food-Folks for the operation of Kentucky Fried Chicken restaurants. Although they are distinct corporate entities, Food-Folks and FFF have the same directors and shareholders." GZK, Inc. v. Schumaker Ltd.Partnership, 168 Ohio App.3d 106, 2006-Ohio-3744, 858 N.E.2d 867, at ¶ 3 (GZK II).
 {¶ 66} We concluded that the trial court had abused its discretion by failing to give Food-Folks the opportunity to address trade secret arguments and to conduct an in-camera review before disclosing the financial documents. 2006-Ohio-3744, at ¶ 34. However, we also found that the trial court did not abuse its discretion in finding Food-Folk's financial documents to be relevant. In this regard, we noted that:
 {¶ 67} "[W]e are disinclined to second-guess the trial court's decision authorizing GZK to review a limited number of Food-Folk's documents. In reaching this conclusion, *Page 19 
we do not ignore the fact that Food-Folks, while technically not a party to this lawsuit, differs from defendant FFF only in name and has been characterized by a Food-Folks corporate director as the `operating arm' of FFF." Id. at ¶ 45.2
 {¶ 68} Following our decision on the discovery issues, the case was remanded to the trial court for further proceedings in July 2006. During the time the case was on appeal, the trial court had issued a decision on May 2, 2006, overruling all the pending motions for summary judgment. The trial court concluded that genuine issues of material fact existed concerning all the elements of tortious interference with contract.
 {¶ 69} The trial court noted that the first element of interference with contract is the existence of a contract. In this regard, the trial court concluded, contrary to our prior opinion, that there was "contradictory evidence" before the court on "the intent of GZK and Schumaker regarding the GZK-Schumaker contract." May 2, 2006 Decision and Order, p. 13. As in its 2002 decision granting summary judgment to FFF, the trial court focused on the use of the words "GZK designee" in the January 22, 2001 contract and the fact that the December 13, 2000 letter agreement stated that GZK would exercise its option of first refusal. Id.
 {¶ 70} The trial court also focused on writings delaying the purchase, which the court took to mean that "GZK negotiated with Schumaker to purchase the property." Id. at 14. Again, this was contrary to our opinion in GZK I. Finally, the court focused on contradictory deposition testimony regarding whether GZK or its "designee" was intended *Page 20 
to purchase the property, and evidence that "KMS-1 actually purchased the property rather than GZK." Id. In denying summary judgment for both sides, the trial court noted that there were factual issues on the remaining elements of the contractual interference claim.
 {¶ 71} Regarding the business interference claim, the court found no genuine issues of material fact concerning whether Schumaker and GZK had a business relationship of which FFF was aware. Therefore, GZK would have established this element as a matter of law. However, the court found genuine issues of material fact on the remaining elements of the business interference claim. Accordingly, the trial court overruled the motions for summary judgment.
 {¶ 72} Two days later, the trial court decided on its own motion to more completely analyze whether GZK had standing to pursue the claim of tortious interference with contract. The court, therefore, established a briefing schedule so that the parties could address this issue. As might be expected, FFF argued that GZK lacked standing because KMS-1 purchased the property. FFF also claimed that no Ohio case had directly reached the issue of whether a tortious interference plaintiff must be a party to the contract. FFF urged the trial court to reject the concept that third-party beneficiaries may sue for tortious interference. Finally, FFF contended that even if the court adopted a third-party beneficiary rule, GZK was an incidental, not an intended, third-party beneficiary.
 {¶ 73} In response, GZK noted that it was the party to all the agreements with Schumaker and that the court of appeals had previously held these agreements enforceable. GZK argued that its eventual decision to transfer its right to purchase to its associate, KMS-1, was based on legitimate business reasons and did not detract from the *Page 21 
fact that GZK was a party to independent and valid contracts prior to the purchase. GZK's claim for interference was based on these contracts, and GZK had sustained admitted lost profits because it was not able to proceed with plans to operate a Famous Recipe restaurant on the property due to FFF's alleged interference. GZK also noted that KMS-1 was merely a financing conduit and was simply going to hold title without benefitting from the acquisition of the property. GZK, therefore, argued that it had sustained an injury in fact from FFF's interference with the contracts.
 {¶ 74} GZK argued alternatively that if the court found that GZK was a third party to the contract, GZK would, at a minimum, be an intended beneficiary, with standing to bring an action. Stanforth's affidavit, attached to GZK's memorandum, indicated that for business and tax reasons, GZK's business strategy had been to acquire store properties via associated entities and to have GZK operate all business operations on the acquired properties, and incur the risk and rewards of these ventures. Stanforth stated that KMS-1 was merely a financing conduit for GZK's restaurant operations, and that all the shareholders in GZK were members in KMS-1. Likewise, all members in KMS-1 were shareholders or officers or both of GZK. Finally, Stanforth testified that GZK and KMS-1 had an agreement whereby all properties acquired by KMS-1 for GZK would involve GZK executing a long-term lease for a term equal to or greater than the underlying debt instrument used by KMS-1 to finance the property. Accordingly, the rents paid under the leases amounted only to debt service costs, and KMS-1 had no interest in the profits or other rewards of any operations on the property.
 {¶ 75} Before the trial court issued a decision on standing, FFF filed a third motion for summary judgment in August 2006. In this motion, FFF again claimed that it was *Page 22 
entitled to summary judgment on the business interference claim.
 {¶ 76} In November 2006, the trial court filed a decision, order, and entry dismissing GZK's claim of tortious interference with contract. The trial court first found that the December 8, 2000 and December 13, 2000 letters indicating the exercise of the right of refusal did not constitute a valid contract because there was no meeting of the minds regarding essential contract terms such as when the contract would close, the consideration that would be paid, and how the consideration would be paid.
 {¶ 77} The trial court then "assumed" for purposes of argument that the letters were a valid contract. However, the court then concluded that the contract was "voided" by the January 22, 2001 agreement, which indicated that "GZK's designee" would purchase the property. The trial court further found that this agreement was illusory because there was no evidence before it that the unnamed designee (now known to be KMS-1) consented to be bound by the terms of the contract.
 {¶ 78} After discussing these matters, the trial court also concluded that GZK ceased to be a real party in interest once KMS-1 executed the purchase agreement and became the owner of the property. Finally, although Ohio law allows intended third-party beneficiaries of contracts to bring actions for alleged breach of contract, the trial court concluded that only a party to a contract has standing to sue for tortious interference with the contract. Accordingly, the court dismissed GZK's claim for contractual interference, based on lack of standing. The court also again denied FFF's motion for summary judgment on tortious interference.
 {¶ 79} In March 2007, GZK filed a motion for reconsideration on the standing issue, providing the court with an affidavit from Stanforth, who stated that KMS-1 had consented *Page 23 
to be bound by the January 22, 2001 agreement and by GZK's exercise of its right of first refusal. GZK also asked the court in March 2007 to issue a Civ. R. 54(B) certification so that the standing issue could be appealed. The court subsequently issued a Civ. R. 54(B) certification, and GZK appealed.
 II. {¶ 80} GZK's First Assignment of Error is as follows:
 {¶ 81} "THE TRIAL COURT ERRED IN FAILING TO ADHERE TO THE LAW OF THE CASE AS SET FORTH IN THIS COURT'S OCTOBER 31, 2003 DECISION."
 {¶ 82} Under this assignment of error, GZK contends that the trial court had no discretion to disregard our decision in GZK I, absent extraordinary circumstances, which did not occur. Conversely, FFF contends that our decision ceased to be the "law of the case" because additional evidence established a "new state of facts."
 {¶ 83} In Nolan v. Nolan (1984), 11 Ohio St.3d 1, 462 N.E.2d 410, the Ohio Supreme Court stated that the law of the case doctrine:
 {¶ 84} "provides that the decision of a reviewing court in a case remains the law of that case on the legal questions involved for all subsequent proceedings in the case at both the trial and reviewing levels. * * *
 {¶ 85} "The doctrine is considered to be a rule of practice rather than a binding rule of substantive law and will not be applied so as to achieve unjust results. * * * However, the rule is necessary to ensure consistency of results in a case, to avoid endless litigation by settling the issues, and to preserve the structure of superior and inferior courts as designed by the Ohio Constitution."11 Ohio St.3d at 3 (citations omitted). *Page 24 
 {¶ 86} After discussing the reasons for the law of the case doctrine, the Ohio Supreme Court adopted the rule in Nolan that "[a]bsent extraordinary circumstances, such as an intervening decision by the Supreme Court, an inferior court has no discretion to disregard the mandate of a superior court in a prior appeal in the same case." Id. at syllabus.
 {¶ 87} The mandate in GZK I was based on the fact that we sustained GZK's first two assignments of error. GZK's first assignment of error challenged the trial court's finding that the contract between GZK and Schumaker was unenforceable. GZK I, 2003-Ohio-5842, at ¶ 15. In the second assignment of error, GZK contended that:
 {¶ 88} "The trial court erred when it failed to award summary judgment in favor of GZK's claim for specific performance of its contract confirming its proper exercise of its right of first refusal that was triggered by Schumaker's November 15, 2000 offer to sell the property to FFF and/or FFF's timely acceptance of the FFF contract." Id. at ¶ 17.
 {¶ 89} After setting forth these assignments of error verbatim, we summarized GZK's argument on the issues, including the contention that the trial court had erred in denying GZK's motion for summary judgment. Id. at ¶ 18. We then said, "We agree with GZK." Id.
 {¶ 90} Furthermore, in discussing the issues, we stated that we found no genuine issues of material fact regarding whether GZK and Schumaker had entered into an enforceable contract. We specifically said that the trial court had erred in finding that GZK was not bound to purchase the property from Schumaker. Id. at ¶ 23. We also stated with respect to the purchase price that "Schumaker was willing to accept $835,000 in cash on December 22, 2000 from FFF for the purchase of the property," and that "[t]here is no *Page 25 
dispute that GZK was willing and able to pay cash for the Property both on December 22, 2000, and throughout the delays thereafter." Id. at ¶ 24.
 {¶ 91} We also held "as a matter of law" that "GZK successfullyexercised its right of first refusal and entered into an enforceablecontract to purchase the Property from Schumaker" Id. at ¶ 25 (emphasis added). We, therefore, sustained the first two assignments of error and remanded the case for further proceedings. Id. The only further proceedings that could have occurred as a result of our decision were for the trial court to award judgment compelling specific performance to GZK for the purchase of the property for $835,000.
 {¶ 92} Although FFF requested reconsideration of our decision (which was denied), FFF did not appeal to the Ohio Supreme Court. Consequently, our decision that the contract was enforceable became final and was not subject to further review.
 {¶ 93} On remand, the trial court did comply with our mandate by signing and filing two orders: the agreed order of January 2004 and the subsequent order of March 2004, both of which required Schumaker to convey the property to GZK in exchange for $835,000 on March 15, 2004.
 {¶ 94} However, the trial court then exceeded the scope of our mandate by revisiting the issue of whether a valid contract existed between GZK and Schumaker. In its May 2, 2006 Decision and Order, the trial court found issues of material fact on whether the contract was enforceable by relying on points we had previously considered and rejected. For example, the court focused on the fact that the December 13, 2000 letter stated that GZK would exercise its option, while the January 22, 2001 agreement used the word "GZK designee." This directly contradicts our finding that GZK was bound to *Page 26 
purchase the property. 2003-Ohio-5842, at ¶ 23.
 {¶ 95} The trial court also focused what it characterized as "writings delaying the purchase," which the court took to mean that "GZK negotiated with Schumaker to purchase the property." May 2, 2006 Decision and Order, at p. 14. Again, this directly contradicts our finding that GZK "was ready willing and able to pay cash for the Property both on December 22, 2000, and throughout the delays thereafter." 2003-Ohio-5842, at ¶ 24. It also contradicts our statement that GZK should not be punished for its attempts to accommodate Schumaker in reaching a different payment agreement than Schumaker had originally accepted from FFF. Id.
 {¶ 96} In finding issues of fact, the trial court also cited contradictory deposition testimony regarding whether GZK or its "designee" was intended to purchase the property, and evidence that KMS-1 actually purchased the property rather than GZK.
 {¶ 97} Subsequently, in the November 2006 decision, the trial court reconsidered its decision and found no genuine issues of material fact on whether a contract existed. The court found that there was no enforceable contract because the December agreements did not did not show a meeting of the minds as to essential contract terms such as when the contract would close, what consideration would be paid, and how the consideration would be paid. Again, this directly contradicts our prior opinion.
 {¶ 98} There was never any dispute as to the contract amount, and any change in the terms of payment was offered solely as an accommodation to Schumaker for tax planning purposes. Closing dates were also extended to provide Schumaker with time to consult her tax advisor, but these accommodations did not mean that there was no meeting of the minds on the essential contract terms. *Page 27 
 {¶ 99} The trial court also violated our mandate by finding, contrary to our opinion, that any contract that might have been formed was "voided" by the January 22, 2001 agreement.
 {¶ 100} Our order did not permit the trial court to take new evidence on whether an enforceable contract existed between Schumaker and GZK.
 {¶ 101} In arguing that the trial court acted permissibly, FFF relies heavily on Stemen v. Shibley (1982), 11 Ohio App.3d 263,465 N.E.2d 460. In Stemen, the Sixth District Court of Appeals held that:
 {¶ 102} "The doctrine of the law of the case does not foreclose a party from filing, nor the court from considering, a new motion for summary judgment, notwithstanding that the trial court, in the same case, had previously granted summary judgment, which judgment was subsequently reversed on appeal, where such new motion is based upon an expanded record." 11 Ohio App.3d 263, paragraph three of the syllabus.
 {¶ 103} FFF contends that admission of evidence indicating that GZK never planned to buy the property itself, and that GZK, in fact, sold the property to a third party is a material change in evidence that justifies disregarding the law of the case. We disagree.
 {¶ 104} We have no general quarrel with the principle announced inStemen, although it is an appellate decision that was issued prior to the Ohio Supreme Court decision in Nolan. Even after Nolan, we have applied the same general principle. See Dayton Power Light Co. v.Barnes (Feb. 23, 1989), Montgomery App. No. 11223, 1989 WL 14722 (DP L). In DP L, we had originally reversed a summary judgment granted to Dayton Power Light Company, because the company failed to submit proper evidentiary materials. On remand, Dayton Power Light Company filed a second motion for *Page 28 
summary judgment and submitted additional evidentiary materials. When the case came before us on appeal again, we cited Stemen and permitted the second summary judgment to stand. Id. at * 1. Johnson v. Morris
(1995), 108 Ohio App.3d 343, 349, 670 N.E.2d 1023, is also of similar effect, holding that the law of the case doctrine does not apply "when subsequent proceedings involve different legal issues or different evidentiary records."
 {¶ 105} The situation in the present case is distingushable. We did not remand this case for further consideration of whether a valid contract existed. GZK's choice to take title to the property in an affiliated holding company was also not a material change in relevant evidence.
 {¶ 106} In arguing that GZK's choice was relevant, FFF relies on a reference we made in GZK I to the fact that neither GZK nor Schumaker indicated the possibility of a third party purchasing the property instead of GZK. 2003-Ohio-5842, at ¶ 23. However, that comment should be read in context. At the time, we were discussing whether GZK was bound to purchase the property from Schumaker. We were well aware that the agreement mentioned purchase by a potential designee. However, the remaining facts and circumstances indicated that GZK intended to acquire the property for its own use. That fact has never changed, and is still true, even though title to the property resides in a close GZK affiliate. We note that this scenario is just like the situation that exists between FFF and its close affiliate, Food-Folks. FFF holds title to property that it leases to Food-Folks, which operates fast-food restaurants on the premises. As we noted in GZK II, "Food-Folks, while technically not a party to this lawsuit, differs from defendant FFF only in name and has been characterized by a Food-Folks corporate director as the `operating *Page 29 
arm' of FFF." 2006-Ohio-3744 at ¶ 45.
 {¶ 107} As an additional matter, after reviewing the record in the present case, we find it hard to imagine how a party could more vigorously assert the existence of a contract — persevering through more than seven years, two lawsuits, three trips to the court of appeals, and what appears to be hundreds of thousands of dollars of legal fees.3
 {¶ 108} More importantly, the trial court erred by focusing on an irrelevant period of time. GZK was the party at all times relevant to the contracts that were allegedly interfered with — (1) GZK's original lease agreement with Schumaker, which provided a right of first refusal and rights precluding non-competing businesses within a certain radius; and (2) agreements between GZK and Schumaker exercising the right of first refusal. The interferences began in November 2000, and continued for a period of time thereafter, if one credits the testimony of Mrs. Schumaker and GZK. The claim arose at that time, not in March 2004, when GZK finally was able to consummate the purchase. As we said, the fact that GZK chose to place title to the property in the name of its affiliate does not alter the fact that GZK was the contracting party who was allegedly prevented from exercising its right of first refusal and using the property to generate profit between November 2000, and March 2004.4 *Page 30 
 {¶ 109} We would also note that the trial court had before it evidence that GZK was the entity sustaining damages, as KMS-1 did not receive profit on the transaction. Specifically, the lease payments to KMS-1 were only sufficient to service the debt service for the property. The entity generating profit (or loss due to alleged interference with contract and business) would have been GZK.
 {¶ 110} As a final matter, we note that even if the trial court had been correct in concluding that GZK was not the real party in interest, the court erred in dismissing the claim for lack of standing. The court should instead have allowed a reasonable time for KMS-1 to be joined as a party. See Gabel v. Miami E. School Bd., Miami App. No. 07-CA916, 2007-Ohio-6590, at ¶ 44-45 (reversing trial court decision dismissing case for lack of standing). In Gabel, we noted that under Civ. R. 17(A):
 {¶ 111} "`Every action shall be prosecuted in the name of the real party in interest. * * * No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest. Such ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.' Accord,Shealy, 20 Ohio St.3d 23, 26."
 {¶ 112} GZKs First Assignment of Error is sustained.
 III. {¶ 113} Because the second and third assignments of error are related, we will *Page 31 
consider them together. GZK's Second Assignment of Error is as follows:
 {¶ 114} "THE TRIAL COURT ERRED IN FINDING THE DECEMBER 13, 2000 CONTRACT WAS ILLUSORY AND UNENFORCEABLE."
 {¶ 115} GZK's Third Assignment of Error is as follows:
 {¶ 116} "THE TRIAL COURT ERRED IN FINDING THE JANUARY 22, 2001 PURCHASE AGREEMENT WAS ILLUSORY AND UNENFORCEABLE."
 {¶ 117} Under these assignments of error, GZK contends that the contract is enforceable even if the law of the case does not apply. In this regard, GZK argues that the parties agreed to all essential terms and GZK did not retain an absolute and unlimited right to determine the nature and extent of its performance. However, these assignments of error are moot, based on the law of the case and our determination that the contract between Schumaker and GZK was enforceable. Accordingly, the Second and Third Assignments of Error are overruled as moot.
 IV. {¶ 118} GZK's Fourth Assignment of Error is as follows:
 {¶ 119} "THE TRIAL COURT ERRED IN FINDING APPELLANT IS NOT A THIRD PARTY BENEFICIARY OF THE PURCHASE AGREEMENT."
 {¶ 120} GZK argues under this assignment of error that, at a minimum, it is a third-party beneficiary of the January 22, 2001 Agreement (referred to in GZK's brief as the "Confirmation Contract"). As was noted, this agreement referred to purchase of the property by GZK's designee. For the reasons discussed above, this assignment of error is moot. We concluded in the prior appeal that GZK and Schumaker entered into a valid agreement for the purchase of the property, and GZK was a party to the contract. *Page 32 
Therefore, there is no need to consider whether GZK was a third-party beneficiary of the January 22, 2001 agreement. The Fourth Assignment of Error is overruled as moot.
 V. {¶ 121} GZK's Fifth Assignment of Error is as follows:
 {¶ 122} "THE TRIAL COURT ERRED IN HOLDING APPELLANT DOES NOT HAVE STANDING TO BRING A CLAIM FOR TORTIOUS INTERFERENCE WITH CONTRACT."
 {¶ 123} Under this assignment of error, GZK contends that the trial court erred in finding that GZK lacked standing to maintain a claim for tortious interference with contract. In this regard, GZK claims that a justiciable controversy exists and that it has a sufficient stake in the outcome. FFF contends that GZK lacks standing because it was not a party to the "agreement." As an alternate basis for affirming the trial court decision, FFF contends that its acts do not constitute tortious interference with contract as a matter of law.
 {¶ 124} "Standing is a threshold question for the court to decide in order for it to proceed to adjudicate the action." State ex rel. Jonesv. Suster, 84 Ohio St.3d 70, 77, 1998-Ohio-275, 701 N.E.2d 1002. However, the issue of lack of standing "challenges the capacity of a party to bring an action, not the subject matter jurisdiction of the court." Id. To decide whether the requirement has been satisfied that an action be brought by the real party in interest, "courts must look to the substantive law creating the right being sued upon to see if the action has been instituted by the party possessing the substantive right to relief." Shealy v. Campbell (1985), 20 Ohio St.3d 23, 25,485 N.E.2d 701.
 {¶ 125} The substantive right to relief for tortious interference with contract is *Page 33 
outlined in Fred Siegel Co., L.P.A. v. Arter Hadden,85 Ohio St.3d 171, 172, 1999-Ohio-260, 707 N.E.2d 853, 856. There, the Ohio Supreme Court indicated that:
 {¶ 126} "The elements of the tort of tortious interference with contract are (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages." Id. at paragraph one of the syllabus.
 {¶ 127} We have already concluded that an enforceable contract existed between GZK and Schumaker, and that GZK was a party to the contract. Our discussion has also indicated that GZK had standing to maintain an action for tortious interference with contract. Therefore, we agree with GZK that the trial court erred in dismissing GZK's claim for lack of standing.5 *Page 34 
 {¶ 128} As we have noted, FFF contends that the judgment should be affirmed because GZK cannot prove a claim for tortious interference as a matter of law. In this regard, FFF claims that it did not have an improper motive and did not use unlawful means. FFF argues that it pursued the property for just one reason — its own business interests.
 {¶ 129} We are permitted to affirm a judgment based on incorrect reasoning if the judgment is legally correct on other grounds.Reynolds v. Budzik (1999), 134 Ohio App.3d 844, 846, n. 3,732 N.E.2d 485. This approach is based on the fact that error is not prejudicial when a court "`achieves the right result for the wrong reason.'"State v. Hutchinson (Mar. 10, 2000), Montgomery App. No. 17852,2000 WL 262650, * 2 (citation omitted).
 {¶ 130} In order to affirm the judgment, we would have to find that FFF should have prevailed on its motion for summary judgment. We note that in May 2006, prior to the decision dismissing the contractual interference claim for lack of standing, the trial court found genuine issues of material fact on contractual interference. The trial court has also consistently overruled FFF's motions for summary judgment on tortious interference with business relationships, which has similar elements. See, e.g., Walter v. ADT Security Systems, Inc., Franklin App. No. 06AP-115, 2007-Ohio-3324, at ¶ 31 (noting that the "main difference between tortious interference with a contract and tortious interference with a business relationship is that interference with a business relationship includes intentional interference with prospective contractual relations, not yet reduced to a contract."). As we noted, FFF filed three separate motions for summary judgment on interference with business relationships, and the trial court has overruled all the motions, *Page 35 
finding genuine issues of material fact.
 {¶ 131} Summary judgment may be granted under Civ. R. 56 only "if there are no genuine issues of material fact remaining to be litigated, the moving party is entitled to judgment as a matter of law, and reasonable minds can come to only one conclusion, and that conclusion is adverse to the nonmoving party, who is entitled to have the evidence construed most strongly in his favor." Smith v. Five RiversMetroParks (1999), 134 Ohio App.3d 754, 760, 732 N.E.2d 422. Accordingly, in order to affirm the trial court's dismissal of GZK's contractual interference claim, we would have to find that there are no genuine issues of material fact, that FFF is entitled to judgment as a matter of law, and that reasonable minds can only come to a conclusion adverse to GZK, after construing the evidence most strongly in GZK's favor.
 {¶ 132} The first two elements of contractual interference have been established as a matter of law, as a contract existed between GZK and Schumaker, and FFF knew of the contract. GZK also presented evidence that FFF intentionally procured the breach of GZK's contracts with Schumaker, satisfying the third element as well, or at least creating material issues of fact on that element.
 {¶ 133} Even if interference is intentional, it must also be improper. In Fred Siegel Co., the Ohio Supreme Court adopted Section 767 of the Restatement of the Law of Torts (1979), which lists factors to be considered in deciding if a party has acted improperly by intentionally interfering with a contract or prospective contract. These factors are:
 {¶ 134} "(a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the *Page 36 
actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties." 85 Ohio St.3d 171, 172, paragraph three of the syllabus.
 {¶ 135} FFF contends that its actions were justified because it was protecting its own bona fide business interests, even if its actions caused "incidental interference" with another's contract. In Fred SiegelCo., the Ohio Supreme Court rejected a law firm's argument that its solicitation of clients of another firm was justified because clients had the legal right to terminate relationships and enter into new representation. Id. at 176-78. The court also rejected the claim that an employee who had joined the new firm had an "ethical duty" under the Disciplinary Rules to inform her prior firm's clients that she was changing firms. Id. Accordingly, the right to advance one's business interests is not unrestricted.
 {¶ 136} The Ohio Supreme Court did allow "fair competition" as a proper ground or justification for interference, but limited it to situations where an existing contact is terminable at will. Id. at 178. Accord Harris v. University Hospitals of Cleveland, Cuyahoga App. Nos. 76724, 76785, 2002-Ohio-983, 2002 WL 363593, * 8, and Wagoner v. LeachCo. (July 2, 1999), Montgomery App. No. 17580, 1999 WL 961166, * 16-17 (finding that a defendant's status as a business competitor cannot protect it from liability if the defendant intentionally interferes with a contract that is not terminable at will).
 {¶ 137} Since the contract between GZK and Schumaker was not terminable at will, the "fair competition" justification does not apply. Furthermore, we find genuine issues of material fact as to whether FFF's conduct was improper, based on the factors listed in Fred SiegelCo. Among the matters we have considered are FFF's knowledge of GZK's *Page 37 
lease agreement and exercise of the right of first refusal, the intimidating and threatening letters FFF sent to Schumaker, the lawsuit FFF filed against Schumaker, the negotiations between FFF and Schumaker that resulted in a second contract between FFF and Schumaker, and the close proximity between these actions and Schumaker's breach of the contract with GZK.6
 {¶ 138} We note that FFF also cites various state and federal cases to support the claim filing a lawsuit to protect a party's "genuine interests" is absolutely privileged activity. This may be true as a general proposition, but "good faith" is an essential ingredient when a party interferes with a contract on the ground that performance of the contract will hamper the party's own legal interests. Clauder v.Holbrook (Jan 28, 2000), Hamilton App. No. C-990145, 2000 WL 98218, * 3. As we noted, genuine issues of material fact exist in the present case concerning whether FFF acted in good faith by filing the lawsuit against Schumaker. Furthermore, as noted, FFF took other actions beyond simply filing suit, and these actions place FFF's good faith and motives at issue.
 {¶ 139} FFF also contends that GZK cannot prevail on a claim for intentional interference with contract because GZK cannot prove that FFF had ill will towards GZK. However, "[a]ctual malice in a tortious interference claim is not ill-will, spite, or hatred; rather, it denotes an unjustified or improper interference with the business relationship."Chandler Assoc, Inc. v. America's Healthcare Alliance, Inc. (1997),125 Ohio App.3d 572, 583, 709 N.E.2d 190.
 {¶ 140} Having found genuine issues of material fact with regard to whether FFF *Page 38 
improperly interfered with the contracts between GZK and Schumaker, we decline FFF's request to affirm the judgment on alternate grounds.
 {¶ 141} Accordingly, the Fifth Assignment of Error is sustained.
 VI {¶ 142} GZK's First and Fifth Assignments of Error having been sustained, and GZK's Second, Third, and Fourth Assignments of Error having been overruled as moot, the judgment in favor of FFF is Reversed, and this cause is Remanded for further proceedings consistent with this opinion.
WOLFF, P.J., and BROGAN, J., concur.
1 The parties to the 1984 lease agreement were GZK and Dorothy Schumaker, individually and as executrix for the estate of Carl Schumaker. Title to the land was placed in Schumaker, L.P. in 1995. Dorothy Schumaker is the sole general partner in the limited partnership and had authority to act for the partnership with regard to the property.
2 This is the same relationship that exists between KMS-1 and GZK. KMS-1 is a corporation that exists for the purpose of buying real estate and leasing it to GZK for operation of Lee's Famous Recipe Fried Chicken and other fast food franchises. Like Food-Folks, GZK is the "operating arm" of KMS-1. March 2007 Stanforth affidavit, ¶ s 4-7.
3 The legal fees for just one of the two law firms representing GZK between December 2000 and April 2004, were in excess of $136,000.
4 By referring to these dates, we are not suggesting that damages occurred during these dates, as that remains an issue for trial. We also are not suggesting that damages are limited to the time between November 2000, and March 2004. We use these dates simply because they represent the time frame between when Mrs. Schumaker signed the purchase agreement and when the property was conveyed, following an agreed order, which in itself is a binding contract. See, e.g., Hayes v. White (Dec. 3, 2001), Columbiana App. No. 01 CO 00, 2001 WL 1568866 (noting that "[a]n agreed judgment entry is the court's acknowledgment that the parties have entered into a binding contract.")
5 We would reach the same conclusion even if GZK were considered a third-party beneficiary of the contract. The trial court and FFF were both incorrect in concluding that Ohio does not or should not permit third-party beneficiaries to recover for tortious interference with contract. The Ohio Supreme Court has indicated that "[o]nly a party to a contract or an intended third-party beneficiary of a contract may bring an action on a contract in Ohio." Grant Thornton v. Windsor House,Inc. (1991), 57 Ohio St.3d 158, 161, 566 N.E.2d 1220, citingVisintine Co. v. New York, Chicago, St. Louis RR. Co. (1959), 169 Ohio St. 505, 9 O.O.2d 4, 160 N.E.2d 311. If an intended third-party beneficiary may recover for breach of contract, it logically follows that the same party may also recover for interference with the contract. Furthermore, Ohio courts have permitted such claims. See Lapping v. HmHealth Services, Trumbull App. No. 2000-T-0061, 2001 WL 1602683, * 3 (reversing directed verdict granted against third-party beneficiary in action for breach of contract and tortious interference with contract, and remanding for re-trial); Sony Electronics, Inc. v. Grass ValleyGroup, Inc., Hamilton App. Nos. C-010133, C-010423, 2002-Ohio-1614,2002 WL 440749, * 4 (affirming dismissal of complaint for tortious interference with contract filed by Sony, based on Sony's failure to allege facts in the complaint from which the court could reasonably infer that Sony was an intended third-party beneficiary to the contract); and Fuller Assoc. v. Heil Windermere Moving Storage Co., Stark App. No. 2004CA00241, 2005-Ohio-2598 (affirming judgment for plaintiff-broker in action for tortious interference with contract, where broker claimed he was third-party beneficiary of purchase agreement entered into by defendants).
6 We are aware of FFF's contention that its letters were not threatening. However, FFF's position is contradicted by Mrs. Schumaker's testimony. *Page 1